## Armstrong *v.* Bickel, Appellant.

217
388C
173
435

*Principal and agent—Stockbrokers—Short sale—Margins.*

Where a customer authorizes a firm of brokers to sell stock " short " for him, that is, to sell on his account stock which he does not have and which they will be compelled to borrow for him, his undertaking with them is to reimburse them for any payments they may be compelled to make in the execution of his order, and to repay them for any losses that may result from it. In such a case in a rapidly rising market, the brokers, after their customer has refused to put up more margin, may purchase the stock, and charge the loss to his account, and they are not obliged to take into consideration rumors communicated to them by him that the stock may on the following day be settled for on a lower basis; nor are the brokers bound to hunt their customer up, and repeat to him every rumor or piece of information that may come to them before they can take steps for their own protection.

Argued Oct. 31, 1906. Appeal, No. 126, Oct. T., 1906, by defendant, from judgment of C. P. No. 1, Allegheny Co., Sept. T., 1901, No. 532, on verdict for plaintiffs in case of John D. Armstrong, Ancillary Administrator of L. R. Bacon, and John D. Armstrong, surviving partner of L. R. Bacon and John D. Armstrong, trading as Lathrop R. Bacon & Company,. v. Charles Bickel. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Assumpsit by a firm of brokers against their customer to recover a balance alleged to be due on a stock transaction. Before MACFARLANE, J.

In addition to the facts stated in the opinion of the Supreme Court it appeared that the order to purchase the 200 shares of the Northern Pacific Railroad Company's common stock was executed at 2:45\p. m. on May 9, 1901, at the rate of $350 per share. A part of the loss was made good by collateral which the plaintiffs held, and they sued to recover the balance.

The court gave binding instructions for plaintiffs.

Verdict and judgment for plaintiffs for $31,075.65. Defendant appealed.

*Error assigned* was in giving binding instructions for plaintiffs.

*J. S. Ferguson*, with him *E. G. Ferguson*, for appellant.— A broker is required to use such skill as is ordinarily possessed and employed by persons of common capacity engaged in the same trade or business, and such diligence as persons of common prudence are accustomed to use about their own business and affairs: Bronnenburg v. Rinker, 2 Ind. Appeals, 391 (28 N. E. Repr. 568); McFarland v. McClees, 17 W. N. C. 547; Hamond v. Holiday, 1 C. & P. 384 ; Pratt v. Patterson, 112 Pa. 475 ; Gheen v. Johnson, 90 Pa. 38 ; Peckham v. Ketchum, 18 N. Y. Superior Ct. 506.

A broker is not authorized, to buy in stock on his client's account, unless he has given a reasonable notice to furnish more margins: Lazare v. Allen, 20 App. Div. 616 (47 N. Y. Supp. 340); Learock v. Paxson, 208 Pa. 602.

The demand for margins must be definite and certain: Boyle v. Henning, 121 Fed. Repr. 376.

*William Kaufman,* with him *Joseph A. Langfitt* and *H. W. McIntosh,* for appellees.—The case is ruled by Morris v. Mc-Cutcheon, 213 Pa. 249.

OPINION BY MR. JUSTICE BROWN, March 4, 1907:

The appellee, John D. Armstrong, and his deceased partner, Lathrop R. Bacon, were brokers doing business in Pittsburg and New York. The appellant was one of their customers, for whom they sold "short," in November, 1900, 200 shares of Northern Pacific Railway stock. They borrowed this stock, through Menzesheimer & Company, their New York correspondents, from Hertzfeld & Stern, a firm of brokers in that city. The "short" sales of the 200 shares of stock had been made at about $60.00 or $70.00 per share. In May, 1901, there was a most extraordinary rise in this stock, due to the efforts of two rival interests to acquire control of a majority of it. On the morning of May 9, at about 10 o'clock, the appellant went to the office of his brokers, and was told by the appellee that the stock might go up to $180 or $200 per share and additional margin was asked for the firm's protection. Bickel complied with this demand and protected the stock by depositing satisfactory collaterals which brought the margin up to $230 per share. So rapid and abnormal was the rise, however, that within an hour the stock was selling at $600 or $700 per share, and Bickel was asked for more margin. To this he replied that he could not margin it at that price; that he had not sufficient margin to give the firm to cover at that price, and that it was all nonsense to request margins, because the firm would not cover the stock. An hour later, at about 12 o'clock, the stock was quoted at $700 or $800 per share, and the request for more margin was renewed by the appellee. Bickel states that he said he could not margin the stock at that price. The reply was that if margins were not given they would have to buy. To this, according to his own testimony, he replied: "I told him he ought not to do that; in fact, he must not do it; if he did he certainly would ruin me and he would hurt himself; and I further told him of a rumor I had

heard. . . . I had heard there would be a settlement made at $150, or something like that, and the answer he gave me was he didn't care about these rumors and he would pay no attention to them." Shortly afterwards the firm bought the stock on account of the appellant and this suit is for the loss sustained.

The appellant had other deals with his brokers, but with them we have no concern. The single question which he now raises is whether as to this one transaction the " short " sales of 200 shares of stock, and the subsequent purchase of the same number by the firm on his account to enable them to return the stock they had borrowed for the purpose of making the sales for him, he had submitted on the trial sufficient evidence of their negligence or failure to perform their duty to him to defeat their right to recover the difference between $350 per share and the sum for which he had protected the stock. Under the facts stated, and which are conceded by the appellant, the court directed a verdict against him, and his complaint is that the jury were not allowed to determine whether there was such a failure on the part of the brokers to perform their duty to him in this transaction as ought to defeat their right to be reimbursed for their loss sustained in purchasing the stock for him.

When Bickel authorized Bacon & Company to sell the stock short for him, that is, to sell on his account stock which he did not have, and which they would be compelled to borrow for him, his undertaking with them was to reimburse them for any payments they might be compelled to make in the execution of his order, and to repay them for any losses that might result from it : Bibb v. Allen, 149 U. S. 481. On the other hand, the duty of the brokers to the customer was to protect him against any loss that might result from disregard of the express terms of their agency, or of an obligation manifestly implied in it. The undertaking of the appellant was to have, at all times, money or securities in the hands of the appellee and his partner sufficient to enable them to buy 200 shares of the stock which they borrowed for him and which they might at any time be called upon to return. All this he well knew and acknowledged his obligation by increasing his margin to $230 per share. When

the extraordinary situation arose later in the day on May 9, his obligation to continue the protection of his brokers did not cease. In the rise and fall of the market they could make no profit in the stock they were handling for him. All they had in the transaction was their usual commission. Gain in it was to be for the customer; and loss in it ought not to be theirs. When called upon for additional margin or protection at 11 o'clock he admits he told the firm that he could not margin the stock at its price at that time. Later in the morning, about 12 o'clock, the appellee called upon him and renewed the request for more margin. This was refused by the appellant. The following is what took place between them at that time, according to his own testimony: " Q. Give us his language? A. He asked me for more margins. I told him I couldn't margin it at that price. Q. What was the price then? A. I believe $700 or $800, as far as I can recollect. Q. Did he ask you for any particular amount? A. No, he didn't. Q. Did you tell him you were all in? A. No, I didn't tell him that. Q. What else was said at that time? A. He told me if I didn't give him margins he would have to buy. Q. What did you say? A. I told him he ought not to do that; in fact, he must not do it; if he did he certainly would ruin me and he would hurt himself; and I further told him of a rumor I had heard. Q. Tell about that? A. I had heard there would be a settlement made at $150 or something like that, and the answer he gave me was, he didn't care about those rumors, and he would pay no attention to them." At this point what was the situation ? The customer had not asked for a reasonable time to enable him to increase the margin, but there was an absolute refusal to further protect the stock, because, as he said, he could not do so. True, he testifies that he told his brokers of a rumor he had heard that there would be a settlement of the stock at $150, and that Armstrong replied he would pay no attention to such rumor. On a mere rumor the brokers would not have been expected as prudent men to delay protecting themselves after their customer had refused to perform his duty of protecting them. He himself did not act on the rumor by putting up more margins, but now complains that the brokers did not out of their own funds protect the stock for him. If they had done so, it would

have been at their peril, for if the stock had continued to rise and if he had been called upon to pay an advanced price for the same, they would have been met by his statement that he had told them he would put up no more margin. Under the circumstances, there was nothing for them to do except what they did. As to this the learned trial judge most aptly and truly said : " Inasmuch as he had not asked for any definite amount of margin, and Bickel had refused, according to his own statement, to margin at the price the stock stood at, $700, it was a situation where Armstrong had to protect his own firm, and he waited at his own risk. If the market had advanced he would have been the loser, and Bickel would have been liable only for a price at which Armstrong could have bought, had he sent in his order at once. As it was, Bickel was a gainer by the delay. It was not, we think, Armstrong's duty to make any further demand under the facts of the case. . . . As for the rumors of a settlement at $150, the defendant had heard them. If he relied upon them he should have put up the margins, or at least offered what he could. His information was as definite as any rumors that were proved by the testimony. The only thing that he did not know was that Hertzfeld & Stern had given notice that they would not require deliveries that day, and, as before said, this was no guaranty as to the next day."

In his charge the learned trial judge said : " On the turning point of the case, as I view it, there are no disputed questions of fact." This is true. What the appellant complains of as the negligence of the appellee's firm is their failure to give him notice of information that had come to them about the situation of the market. With the stock jumping, according to the testimony, $75.00 and $100 at a time, reaching $1,000 per share at 11:30, the brokers were not bound to hunt him up and repeat to him every rumor or piece of information that had come to them before they could take steps for their own protection. After his refusal to protect them they were not required, in the admitted condition of the market, to go to him, after hearing rumors or receiving information, and give him an opportunity to reconsider his determination not to protect the stock. They were in peril, placed there by his failure of duty to them, and their right was to go into the

market and purchase the stock at the best price for which they could buy it. This is all they did, and there is not even the appearance of any failure of duty by the firm of the appellee to the appellant.

Judgment affirmed.